In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 17-1206

DALE E. KLEBER,

*Plaintiff-Appellant,*

*v.*

CAREFUSION CORPORATION,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-1994 — **Sharon Johnson Coleman**, *Judge.*

———————————

ARGUED SEPTEMBER 6, 2018 — DECIDED JANUARY 23, 2019

———————————

Before WOOD, *Chief Judge*, and BAUER, FLAUM, EASTERBROOK, KANNE, ROVNER, SYKES, HAMILTON, BARRETT, BRENNAN, SCUDDER, and ST. EVE, *Circuit Judges*.

SCUDDER, *Circuit Judge*. After Dale Kleber unsuccessfully applied for a job at CareFusion Corporation, he sued for age discrimination on a theory of disparate impact liability. The district court dismissed his claim, concluding that § 4(a)(2) of the Age Discrimination in Employment Act did not authorize job applicants like Kleber to bring a disparate impact claim

against a prospective employer. A divided panel of this court reversed. We granted *en banc* review and, affirming the district court, now hold that the plain language of § 4(a)(2) makes clear that Congress, while protecting employees from disparate impact age discrimination, did not extend that same protection to outside job applicants. While our conclusion is grounded in § 4(a)(2)'s plain language, it is reinforced by the ADEA's broader structure and history.

**I**

In March 2014, Kleber, an attorney, applied for a senior in-house position in CareFusion's law department. The job description required applicants to have "3 to 7 years (no more than 7 years) of relevant legal experience." Kleber was 58 at the time he applied and had more than seven years of pertinent experience. CareFusion passed over Kleber and instead hired a 29-year-old applicant who met but did not exceed the prescribed experience requirement.

Kleber responded by bringing this action and pursuing claims for both disparate treatment and disparate impact under § 4(a)(1) and § 4(a)(2) of the ADEA. Relying on our prior decision in *EEOC v. Francis W. Parker School*, 41 F.3d 1073 (7th Cir. 1994), the district court granted CareFusion's motion to dismiss Kleber's disparate impact claim, reasoning that the text of § 4(a)(2) did not extend to outside job applicants. Kleber then voluntarily dismissed his separate claim for disparate treatment liability under § 4(a)(1). This appeal followed.

## II

### A

We begin with the plain language of § 4(a)(2). "If the statutory language is plain, we must enforce it according to its terms." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). This precept reinforces the constitutional principle of separation of powers, for our role is to interpret the words Congress enacts into law without altering a statute's clear limits. See *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S. Ct. 1938, 1949 (2016).

Section 4(a)(2) makes it unlawful for an employer

> to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.

29 U.S.C. § 623(a)(2).

By its terms, § 4(a)(2) proscribes certain conduct by employers and limits its protection to employees. The prohibited conduct entails an employer acting in any way to limit, segregate, or classify its employees based on age. The language of § 4(a)(2) then goes on to make clear that its proscriptions apply only if an employer's actions have a particular impact— "depriv[ing] or tend[ing] to deprive any individual of employment opportunities or otherwise adversely affect[ing] his status as an employee." This language plainly demonstrates that the requisite impact must befall an individual with "status as an employee." Put most simply, the reach of § 4(a)(2) does not extend to applicants for employment, as common dictionary definitions confirm that an applicant has no "status as an employee." See Merriam-Webster's Collegiate

Dictionary 60, 408 (11th ed. 2003) (defining "applicant" as "one who applies," including, for example, "a job [applicant]," while defining "employee" as "one employed by another usu[ally] for wages or salary and in a position below the executive level").

Subjecting the language of § 4(a)(2) to even closer scrutiny reinforces our conclusion. Congress did not prohibit just conduct that "would deprive or tend to deprive any individual of employment opportunities." It went further. Section 4(a)(2) employs a catchall formulation—"or otherwise adversely affect his status as an employee"—to extend the proscribed conduct. Congress's word choice is significant and has a unifying effect: the use of "or otherwise" serves to stitch the prohibitions and scope of § 4(a)(2) into a whole, first by making clear that the proscribed acts cover all conduct "otherwise affect[ing] his status as an employee," and, second, by limiting the reach of the statutory protection to an individual with "status as an employee." See *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 964 (11th Cir. 2016) (*en banc*) (interpreting § 4(a)(2) the same way and explaining that the "or otherwise" language "operates as a catchall: the specific items that precede it are *meant* to be subsumed by what comes after the 'or otherwise'").

Kleber begs to differ, arguing that § 4(a)(2)'s coverage extends beyond employees to applicants for employment. He gets there by focusing on the language in the middle of § 4(a)(2)—"deprive or tend to deprive any individual of employment opportunities"—and contends that the use of the expansive term "any individual" shows that Congress wished to cover outside job applicants. If the only question were whether a job applicant counts as "any individual,"

Kleber would be right. But time and again the Supreme Court has instructed that statutory interpretation requires reading a text as a whole, and here that requires that we refrain from isolating two words when the language surrounding those two words supplies essential meaning and resolves the question before us. See, *e.g.*, *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) (describing statutory construction as a "holistic endeavor"); see also *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (directing courts to consider "the language and design of the statute as a whole"); *Trustees of Chicago Truck Drivers v. Leaseway Transp. Corp.*, 76 F.3d 824, 828 (7th Cir. 1996) (emphasizing the same points and explaining that the meaning of statutory text comes from reading language in context and not words in insolation).

Reading § 4(a)(2) in its entirety shows that Congress employed the term "any individual" as a shorthand reference to someone with "status as an employee." This construction is clear from Congress's use of language telling us that the provision covers "any individual" deprived of an employment opportunity because such conduct "adversely affects his status as an employee." Put differently, ordinary principles of grammatical construction require connecting "any individual" (the antecedent) with the subsequent personal possessive pronoun "his," and upon doing so we naturally read "any individual" as referring and limited to someone with "status as an employee." See *Flora v. United States*, 362 U.S. 145, 150 (1960) ("This Court naturally does not review congressional enactments as a panel of grammarians; but neither do we regard ordinary principles of English prose as irrelevant to a construction of those enactments."). The clear takeaway is that a covered individual must be an employee.

Our conclusion becomes ironclad the moment we look beyond § 4(a)(2) and ask whether other provisions of the ADEA distinguish between employees and applicants. See *Mount Lemmon Fire Dist. v. Guido*, 139 S. Ct. 22, 24 (2018) (endorsing this same approach when interpreting the ADEA's various definitions of "employer"). We do not have to look far to see that the answer is yes.

Right next door to § 4(a)(2) is § 4(a)(1), the ADEA's disparate treatment provision. In § 4(a)(1), Congress made it unlawful for an employer "*to fail or refuse to hire* or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (emphasis added). All agree that § 4(a)(1), by its terms, covers both employees and applicants. See, *e.g.*, *Kralman v. Ill. Dep't of Veterans' Affairs*, 23 F.3d 150, 152–53 (7th Cir. 1994) (treating an applicant's right to bring a claim under § 4(a)(1) as unquestioned). Compelling this consensus is § 4(a)(1)'s use of the words "to fail or refuse to hire or to discharge," which make clear that "any individual" includes someone seeking to be hired. 29 U.S.C. § 623(a)(1).

Yet a side-by-side comparison of § 4(a)(1) with § 4(a)(2) shows that the language in the former plainly covering applicants is conspicuously absent from the latter. Section 4(a)(2) says nothing about an employer's decision "to fail or refuse to hire … any individual" and instead speaks only in terms of an employer's actions that "adversely affect his status as an employee." We cannot conclude this difference means nothing: "when 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—the Court presumes that Congress intended

a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

There is even more. A short distance away from § 4(a)(2) is § 4(c)(2), which disallows labor organizations from engaging in particular conduct. Section 4(c)(2), in pertinent part, makes it unlawful for a labor organization

> to limit, segregate, or classify its membership … in any way which would deprive or tend to deprive any individual of employment opportunities … or otherwise adversely affect his status as an employee *or as an applicant for employment*, because of such individual's age.

29 U.S.C. § 623(c)(2) (emphasis added).

The parallel with § 4(a)(2) is striking: both provisions define the prohibited conduct in terms of action that "would deprive or tend to deprive any individual of employment opportunities," only then to include the "or otherwise adversely affect" catchall language. But there is a big difference between the two provisions: § 4(c)(2)'s protection extends to any individual with "status as an employee or *as an applicant for employment*," whereas Congress limited § 4(a)(2)'s reach only to someone with "status as an employee."

Consider yet another example. In § 4(d), Congress addressed employer retaliation by making it "unlawful for an employer to discriminate against any of his *employees or applicants for employment"* because such an individual has opposed certain unlawful practices of age discrimination. 29 U.S.C. § 623(d) (emphasis added). Here, too, the distinction between "employees" and "applicants" jumps off the page.

Each of these provisions distinguishes between employees and applicants. It is implausible that Congress intended no such distinction in § 4(a)(2), however, and instead used the term employees to cover both employees and applicants. To conclude otherwise runs afoul of the Supreme Court's admonition to take statutes as we find them by giving effect to differences in meaning evidenced by differences in language. See *Mount Lemmon Fire Dist.*, 139 S. Ct. at 26 (declining the defendant's invitation to take language from one part of a sentence and then "reimpose it for the portion" of the sentence in which Congress omitted the same language); see also *Dep't of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 919 (2015) (explaining that "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another").

In the end, the plain language of § 4(a)(2) leaves room for only one interpretation: Congress authorized only employees to bring disparate impact claims.

B

Kleber urges a different conclusion in no small part on the basis of the Supreme Court's 1971 decision in *Griggs v. Duke Power Co.*, 401 U.S. 424, where the Court interpreted § 703(a)(2) of Title VII and held that disparate impact was a viable theory of liability. Indeed, Kleber goes so far as to say *Griggs*—a case where the Court considered language in Title VII that at the time paralleled the language we consider here—controls and mandates a decision in his favor. We disagree.

A commonsense observation is warranted at the outset. If Kleber is right that *Griggs*, a Title VII case, compels the

conclusion that § 4(a)(2) of the ADEA authorizes outside job applicants to bring a disparate impact claim, we find it very difficult to explain why it took the Supreme Court 34 years to resolve whether anyone—employee or applicant—could sue on a disparate impact theory under the ADEA, as it did in *Smith v. City of Jackson*, 544 U.S. 228 (2005). There was no need for the Court to decide *Smith* if (all or part of) the answer came in *Griggs*. And when the Court did decide *Smith* the Justices' separate opinions recognized the imperative of showing impact to an individual's "status as an employee" when discerning the reach of § 4(a)(2). See *id.* at 235–36, 236 n.6 (plurality opinion); see *id.* at 266 (O'Connor, J., concurring, joined by Kennedy & Thomas, JJ.).

Kleber's position fares no better within the four corners of *Griggs* itself. Several African-American employees of Duke Power challenged the company's practice of conditioning certain job transfers and promotions on graduating from high school and passing a standardized aptitude test. See 401 U.S. at 426. The employees sued under § 703(a) of Title VII, a provision that in 1971 mirrored the present language of § 4(a)(2) of the ADEA. See *id.* at 426 n.1. The Court held that § 703(a)(2) prohibits disparate impact discrimination by proscribing "practices that are fair in form, but discriminatory in operation" unless an employer can show that the challenged practice is "related to job performance" and thus a "business necessity." *Id.* at 431.

Kleber would have us read *Griggs* beyond its facts by focusing on language in a couple of places in the Court's opinion that he sees as covering employees and applicants alike. We decline the invitation. Nowhere in *Griggs* did the Court state that its holding extended to job applicants. And that

makes perfect sense because nothing about the case, brought as it was by employees of Duke Power and not outside applicants, required the Court to answer that question. The language that Kleber insists on reading in isolation must be read in context, and the totality of the *Griggs* opinion makes clear that the Court answered whether Duke Power's African-American employees could bring a claim for disparate impact liability based on practices that kept them from pursuing different, higher-paying jobs within the company.

What happened a year after *Griggs* cements our conclusion. In 1972, Congress amended § 703(a)(2) of Title VII—the provision at issue in *Griggs*—by adding language to expressly include "applicants for employment." Pub. L. No. 92-261, § 8(a), 86 Stat. 109 (1972). This amendment occurred in the immediate wake of *Griggs* and, in this way, reflected Congress's swift and clear desire to extend Title VII's disparate impact protection to job applicants. There was no need for Congress to amend § 703(a)(2) if the provision had always covered job applicants and especially if the Supreme Court had just said so in *Griggs*. To conclude otherwise renders the 1972 amendment a meaningless act of the 92nd Congress, and we are reluctant to conclude that substantive changes to statutes reflect idle acts.

The Supreme Court endorsed this precise course of analysis—giving effect to "Congress's decision to amend Title VII's relevant provisions but not make similar changes to the ADEA"—in *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 174 (2009). The Court there considered whether a plaintiff suing under § 4(a)(1) of the ADEA must establish that age was the but-for cause of an employer's adverse action. See *id*. at 173. The plaintiff urged the Court to adopt Title VII's lesser

standard of race being only a motivating factor in the challenged decision. See *id.* Paramount to the Court's conclusion that an ADEA plaintiff must prove but-for causation were textual differences between the ADEA and Title VII brought about by Congress's amendments to Title VII. See *id*. at 174 (explaining that "Congress neglected to add such a [motivating-factor] provision to the ADEA when it amended Title VII [in 1991]" and emphasizing that "[w]hen Congress amends one statutory provision but not another, it is presumed to have acted intentionally"). The Court's instruction was clear: prior decisions interpreting Title VII "do not control our construction of the ADEA" where the text of the two statutes are "materially different." *Id*. at 173.

And so it is here. Congress's choice to add "applicants" to § 703(a)(2) of Title VII but not to amend § 4(a)(2) of the ADEA in the same way is meaningful. *Gross* teaches that we cannot ignore such differences in language between the two enactments. And, at the risk of understatement, *Gross* is far from an aberration in statutory construction. A mountain of precedent supports giving effect to statutory amendments. See, *e.g.*, *United States v. Quality Stores, Inc.*, 572 U.S. 141, 148 (2014) (quoting *Stone v. INS*, 514 U.S. 386, 397 (1995)) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."); *Fidelity Fin. Servs., Inc. v. Fink*, 522 U.S. 211, 220–21 (1998) (explaining that after Congress modified the federal statute controlling when a transfer of a security interest was perfected, "we see no basis to say that subsequent amendments removing references to state-law options had the counterintuitive effect of deferring to such [state law] options" without unwinding the statutory amendments); *United States v. Wells*, 519 U.S. 482, 492–93 (1997) (explaining that after Congress amended the federal

criminal statute pertinent to false representations to remove any express reference to materiality, "the most likely inference in these circumstances is that Congress deliberately dropped the term 'materiality' without intending materiality to be an element of [18 U.S.C.] § 1014"); *Stone*, 514 U.S. at 397–98 (explaining that after Congress amended the Immigration and Naturalization Act, "[t]he reasonable construction [was] that the amendment was enacted as an exception, not just to state an already existing rule").

In no way does this analysis downplay *Griggs*, as our dissenting colleagues contend. We have approached *Griggs* as binding precedent and construed its holding not only by reading what the Supreme Court's opinion says (and does not say), but also in light of Congress's immediately amending Title VII (but not § 4(a)(2) of the ADEA) to cover "applicants" as well as the broader development in the law ever since, including with precedents like *Smith* in 2005 and *Gross* in 2009.

The upshot is clear: while Congress amended § 703(a)(2) of Title VII in 1972 to cover "applicants for employment," it has never followed suit and modified § 4(a)(2) of the ADEA in the same way. And this is so despite Congress's demonstrating, just a few years after *Griggs*, that it knew how to amend the ADEA to expressly include outside job applicants. See *Villarreal*, 839 F.3d at 979–80 (Rosenbaum, J., concurring) (observing that Congress amended the ADEA in 1974 to extend the statute's reach to federal-government employment, and in doing so, explicitly referenced both "employees and applicants for employment" in the new provision, 29 U.S.C. § 633a).

Today, then, § 703(a)(2) of Title VII differs from § 4(a)(2) in at least one material respect: the protections of the former

extend expressly to "applicants for employment," while the latter covers only individuals with "status as an employee." We underscored this exact difference 14 years ago in our opinion in *Francis W. Parker*, and we do so again today. See 41 F.3d at 1077 ("The 'mirror' provision in the ADEA omits from its coverage, 'applicants for employment.'"). The plain language of § 4(a)(2) controls and compels judgment in CareFusion's favor.

## C

Beyond his reliance on *Griggs*, Kleber invites us to read the ADEA against the backdrop of Congress's clear purpose of broadly prohibiting age discrimination. On this score, he points us to the Supreme Court's decision in *Robinson v. Shell Oil Company*, 519 U.S. 337 (1997) and to the report of the former Secretary of the Department of Labor, Willard Wirtz.

In *Robinson*, the Court held that § 704(a) of Title VII extended not just to "employees" (a term used in § 704(a)), but also to former employees. See *id*. at 346. The Court emphasized that, while the meaning of "employees" was ambiguous, Title VII's broader structure made plain that Congress intended the term to cover former employees, a construction that furthered Title VII's broader purposes. None of this helps Kleber. (Indeed, if anything, *Robinson*'s clear observation of the distinct and separate meaning of "employees" and "applicants for employment" in § 704(a) severely undermines Kleber's textual argument. See *id*. at 344.) *Robinson*, in short, provides direction on how courts— if confronted with statutory ambiguity—should resolve such ambiguity. There being no ambiguity in the meaning of § 4(a)(2) of the ADEA, our role ends—an outcome on all fours with *Robinson*.

The Wirtz Report reflected the Labor Department's response to Congress's request for recommended age discrimination legislation, and a plurality of the Supreme Court in *Smith* treated the Report as an authoritative signal of Congress's intent when enacting the ADEA. See *Smith*, 544 U.S. at 238. We do too.

Nobody disputes that the Wirtz Report reinforces Congress's clear aim of enacting the ADEA to prevent age discrimination in the workplace by encouraging the employment of older persons, including older job applicants. But we decline to resolve the question presented here on the basis of broad statutory purposes or, more specifically, to force an interpretation of but one provision of the ADEA (here, § 4(a)(2)) to advance the enactment's full objectives.

Our responsibility is to interpret § 4(a)(2) as it stands in the U.S. Code and to ask whether the provision covers outside job applicants. We cannot say it does and remain faithful to the provision's plain meaning. It remains the province of Congress to choose where to draw legislative lines and to mark those lines with language. Our holding gives effect to the plain limits embodied in the text of § 4(a)(2).

The ADEA, moreover, is a wide-ranging statutory scheme, made up of many provisions beyond § 4(a)(2). And a broader look at the statute shows that outside job applicants have other provisions at their disposal to respond to age discrimination. Section 4(a)(1), for example, prevents an employer from disparately treating both job applicants and employees on the basis of age. See 29 U.S.C. § 623(a)(1). Section 4(c)(2), prevents a labor organization's potential age discrimination against both job applicants and employees. See 29 U.S.C. § 623(c)(2).

Today's decision, while unfavorable to Kleber, leaves teeth in § 4(a)(2). The provision protects older employees who encounter age-based disparate impact discrimination in the workplace. And Congress, of course, remains free to do what the judiciary cannot—extend § 4(a)(2) to outside job applicants, as it did in amending Title VII.

For these reasons, we AFFIRM.

EASTERBROOK, *Circuit Judge*, dissenting. I do not join the majority's opinion, because the statute lacks a plain meaning. *Robinson v. Shell Oil Corp.*, 519 U.S. 337 (1997), held that the word "employees" in one part of Title VII includes ex-employees. *Robinson* interpreted text in context. Here, too, the judiciary must look outside one subsection to tell whether "individual" in 29 U.S.C. §623(a)(2) includes applicants for employment.

But neither do I join all of Judge Hamilton's dissent, which relies on legislative purpose. The purpose of a law is imputed by judges; it is not a thing to be mined out of a statute. Even when we know what direction the legislature wanted to move, we must know how far to go—and making that choice is a legislative task. See, e.g., *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987). Our job is to apply the enacted text, the only thing to which the House, the Senate, and the President all subscribed, not to plumb legislators' hopes and goals.

Section 623(a) provides:

It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this chapter.

The word "individual" in paragraph (1) includes applicants for employment; everyone agrees on this much. "Individual" reappears in paragraph (2), and normally one word used in adjacent paragraphs means a single thing. See Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2011) (Canon 25: Presumption of Consistent Usage). Maybe the trailing phrase in paragraph (2)—"otherwise adversely affect his status as an employee"—implies that the word "individual" in paragraph (2) means only employees. That's what the majority believes. But maybe, as Part I.C of Judge Hamilton's dissent suggests, this phrase establishes an independent set of rights for employees, without implying that applicants for employment are not "individuals."

The statutory context does not point ineluctably to one understanding. The majority does not explain why the statute would use "individual" in dramatically different ways within the space of a few words. But the principal dissent does not explain how we can read "individual" in paragraph (2) to include "applicant" without causing paragraphs (1) and (2) to converge. If that happens, then paragraph (2) applies disparate-impact analysis to all employment actions. That leaves little or nothing for paragraph (1) to do, for paragraph (2), no less than paragraph (1), prohibits disparate treatment.

*Smith v. Jackson*, 544 U.S. 228, 236 n.6 (2005) (plurality opinion), tells us that paragraphs (1) and (2) have different scopes and that only paragraph (2) provides disparate-impact liability. That conclusion is enough by itself to expose problems in Part III of Judge Hamilton's dissent, which in the name of legislative purpose would extend disparate-impact analysis across the board. Yet this does not help us to

know what "individual" in paragraph (2) *does* mean. Perhaps Justice O'Connor was right in *Smith*, 544 U.S. at 247–68 (concurring opinion), and we should not impute disparate-impact liability to paragraph (2). The question we are addressing today may have no answer; it may be an artifact of the way the plurality in *Smith* distinguished paragraph (1) from paragraph (2), and if Justice O'Connor is right there's no need to search for that nonexistent answer. But that mode of resolving this suit is not open to a court of appeals.

Because neither text nor purpose offers a satisfactory solution, we should stop with precedent. *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), treats the word "individual" in 42 U.S.C. §2000e–2(a)(2), as it stood before an amendment in 1972, as including applicants for employment. The pre-1972 version of that statute is identical to the existing text in §623(a); Congress copied this part of the ADEA from that part of Title VII. It may be that the Court in *Griggs* was careless to treat outside applicants for employment as "individuals" in paragraph (2), but that is what the Justices did. Part II of Judge Hamilton's opinion shows how this came to happen and also shows that many of the Supreme Court's later decisions read *Griggs* to hold that paragraph (2) in the pre-1972 version of Title VII applies disparate-impact theory to outside applicants for employment. If the Justices think that this topic (or *Smith* itself) needs a new look, the matter is for them to decide. I therefore join Part II of Judge Hamilton's dissenting opinion.

HAMILTON, *Circuit Judge*, dissenting, joined by WOOD, *Chief Judge*, and ROVNER, *Circuit Judge*, and joined as to Part II by EASTERBROOK, *Circuit Judge*.

We should reverse the district court's Rule 12(b)(6) dismissal of plaintiff Dale Kleber's disparate impact claim and remand for further proceedings. The key provision of the Age Discrimination in Employment Act prohibits both employment practices that discriminate intentionally against older workers and those that have disparate impacts on older workers. 29 U.S.C. § 623(a); *Smith v. City of Jackson*, 544 U.S. 228 (2005). The central issue in this appeal is whether the disparate-impact provision, § 623(a)(2), protects only current employees or whether it protects current employees *and* outside job applicants.

We should hold that the disparate-impact language in § 623(a)(2) protects both outside job applicants and current employees. Part I of this opinion explains why that's the better reading of the statutory text that is at worst ambiguous on coverage of job applicants. While other ADEA provisions protect job applicants more clearly, the Supreme Court guides us away from the majority's word-matching and toward a more sensible and less arbitrary reading. See *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341–46 (1997).

Part II explains that protecting outside job applicants tracks the Supreme Court's reading of identical statutory language in Title VII of the Civil Rights Act of 1964. In *Griggs v. Duke Power Co.*, 401 U.S. 424, 426 n.1, 431 (1971), the Court found that this same disparate-treatment language protects not only current employees but also "the job-seeker" —people like plaintiff Kleber. We should read the same language the

same way. The majority tries to avoid this reasoning by narrowing *Griggs* and attributing significance to the 1972 amendment of the Title VII disparate-impact provision. As detailed in Part II, the actual facts of both the *Griggs* litigation and the 1972 amendment flatly contradict the majority's glib and unsupported theories.

Part III explains that protecting both outside applicants and current employees is also more consistent with the purpose of the Act (as set forth in the statute itself) and avoids drawing an utterly arbitrary line. Neither the defendant nor its amici have offered a plausible policy reason why Congress might have chosen to allow disparate-impact claims by current employees, including internal job applicants, while excluding outside job applicants. The en banc majority does not even try to do so, following instead a deliberately naïve approach to an ambiguous statutory text, closing its eyes to fifty years of history, context, and application.

I. *The Text of the ADEA's Disparate-Impact Provision*

   A. *Statutory Text of Disputed Provision*

We begin with the statutory language, of course. We analyze the specific words and phrases Congress used, but we cannot lose sight of their "place in the overall statutory scheme," since we "construe statutes, not isolated provisions." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015), quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), and *Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010). As the Supreme Court explained in dealing with a similar issue in Title VII: "The plainness or ambiguity of statutory language is de-

termined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341, 346 (protection of "employees" from retaliation included former employees).

The key provision of the ADEA, 29 U.S.C. § 623(a), reads:

> It shall be unlawful for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
>
> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
>
> (3) to reduce the wage rate of any employee in order to comply with this chapter.

The disparate-treatment provision, paragraph (a)(1), does not refer to job applicants, but it clearly applies to them by making it unlawful for the employer "to fail or refuse to hire … any individual … because of such individual's age." The disparate-impact provision, paragraph (a)(2), also does not refer specifically to applicants or hiring decisions, but its broad language easily reaches employment practices that hurt older job applicants as well as current older employees.

Start with the critical statutory language, which includes two parallel provisions that prohibit employers from engaging in certain behavior. Under paragraph (a)(1), an employer may not intentionally discriminate against an older individual by firing or failing to hire or promote her because she is older—i.e., engage in disparate treatment of older individuals. Paragraph (a)(2) prohibits an employer from creating an internal employee classification or limitation that has the effect of depriving "any individual of employment opportunities" or adversely affecting his or her status as an employee because of age—i.e., creating an internal classification system with a disparate impact against older individuals.

If an employer classifies a position as one that must be filled by someone with certain minimum or maximum experience requirements, it is classifying its employees within the meaning of paragraph (a)(2). If that classification "would deprive or tend to deprive any individual of employment opportunities" because of the person's age, paragraph (a)(2) can reach that classification. The broad phrase "any individual" reaches job applicants, so the focus turns to the employer's action and its effects—i.e., whether the employer has classified jobs in a way that tends to limit *any* individual's employment opportunities based on age. See *Smith*, 544 U.S. at 234, 235–38 (plurality) (explaining that this "text focuses on the *effects* of the action" and not the employer's motive); *id.* at 243 (Scalia, J., concurring).[1] The defendant's maximum-experience requirement in this case certainly limited plaintiff Kleber's employment opportunities.

---

[1] Justice Scalia joined Parts I, II, and IV of the *Smith* opinion by Justice Stevens and wrote that he also agreed with Justice Stevens's reasoning in Part III. 544 U.S. at 243. I therefore treat all parts of the *Smith* opinion by

B.  *The Majority's Cramped Reading*

To avoid this conclusion, the majority emphasizes the
phrase "or otherwise adversely affect his status as an em-
ployee," reading it to limit the statute's disparate-impact pro-
tection "to an individual with 'status as an employee.'" Ante
at 4. Note that the key "with" in that phrase—repeated several
times in the majority opinion—comes only from the majority,
not from the statute itself. It's not correct. The antecedent of
"his" is "any individual," and "otherwise adversely affect" is
even broader than "deprive or tend to deprive any individual
of employment opportunities."

The crux of the majority's argument is that if "any individ-
ual" is not already employed by the employer in question, the
individual does not yet have "status as an employee" and so
is not protected from policies or practices that have disparate
impacts because of age. The majority thus concludes that a
"person's status as an employee" cannot be affected unless
the person is *already* an employee. If that's true, then para-
graph (a)(2) subtly limits its protections from disparate im-
pacts to people who already possess "status as an employee"
with the defendant-employer.

The majority's analysis nullifies the two uses of the broad
word "individual," which certainly reaches job applicants.
What Congress meant to say, the majority argues, is that it's
unlawful for an employer "to limit, segregate, or classify his
employees in any way which would deprive or tend to de-
prive any *current employee* [not "any individual"] of employ-
ment opportunities or otherwise adversely affect his status as

Justice Stevens as authoritative without repeatedly citing Justice Scalia's
concurrence as well.

an employee, because of such *employee's* [not "individual's"] age."

How does one read a bar against depriving "any individual" of "employment opportunities" to exclude all cases where a person is looking for a job? And if Congress meant to limit the provision's coverage only to current employees, why didn't it just use the word "employee"? It had used that word twice in this provision already. Courts are generally loath to read statutory terms out of a textual provision and to insert limitations that are not evident in the text. See *Mount Lemmon Fire District v. Guido*, 139 S. Ct. 22, 26 (2018) (refusing to read limitation into ADEA's coverage that is not apparent from text, noting that "[t]his Court is not at liberty to insert the absent qualifier").

C. *The Better Reading*

If we look at the language of paragraph (a)(2) in isolation, the majority's mechanical reading has some superficial plausibility, but it should be rejected. At the textual level, there are three distinct and fundamental problems.

First, as Judge Easterbrook points out, the majority's theory gives the phrase "any individual" very different meanings in adjoining paragraphs (a)(1) and (a)(2) of § 623. Ante at 17. See also, e.g., *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980) (declining to interpret § 706 of Title VII so that the word "filed" would have different meanings in different subsections).

Second, the majority merely assumes that "affect his status as an employee" necessarily *limits* the already broad phrase, "deprive or tend to deprive any individual of employment opportunities." It is not self-evident—at least as a matter of

*plain* meaning—that the latter "status" phrase must be read as limiting the former. A list culminating in an "or otherwise" term can instead direct the reader to consider the last phrase as a catch-all alternative, "in addition to" what came before, to capture prohibited actions that might otherwise escape the statute's reach. For example, an employer can violate the ADEA by adversely affecting the status of its employees (e.g., by giving bigger raises to junior employees, as alleged in *Smith*, 544 U.S. at 231) without depriving an individual of employment opportunities such as better jobs and promotions. In this sense, paragraph (a)(2) "enumerates various factual means of committing a single element"—imposing employment policies that have disparate impacts on older workers. See *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016) (discussing various ways to write an "alternatively phrased law").

In *Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.*, 139 S. Ct. —, — (2019), the Supreme Court rejected a remarkably similar argument that attempted to use an "otherwise" phrase to limit what came before. Much like the majority here, the patentee argued that "otherwise available to the public" in the Patent Act's "on sale" bar meant that the preceding language also required *public* availability after a sale. The patentee "places too much weight on [the] catchall phrase. Like other such phrases, 'otherwise available to the public' captures material that does not fit neatly into the statute's enumerated categories but is nevertheless meant to be covered." See also *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009) (explaining that "the whole value of a generally phrased residual clause, like the one used in the second proviso, is that it serves as a catchall for matters not specifically contemplated—known unknowns"). If "otherwise adversely affect his status

as an employee" does not *necessarily* limit the entire disparate-impact phrase—if it is instead a catch-all phrase for known unknowns, as the Supreme Court explained in *Texas Dep't of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2519 (2015) (linking "otherwise" phrases in ADEA, Title VII, and Fair Housing Act as establishing textual foundations for disparate-impact protection)—the majority's textual analysis collapses.

Third, even if "status as an employee" must be affected to state a disparate-impact claim under (a)(2), the majority's conclusion also depends entirely on the unlikely notion that "status as an employee" is not "adversely affected" when an employer denies an individual the opportunity to become an employee in the first place. Refusing to hire an individual has the most dramatic possible adverse effect on that individual's "status as an employee." Reading "status as an employee" broadly, to include whether the individual is an employee or not, is consistent with the actual words Congress used in repeatedly referring to "individuals," and with ordinary usage. Courts often speak of "denying status" of one sort or another.[2]

---

[2] Judge Martin's dissent in *Villarreal v. R.J. Reynolds Tobacco Company* collected several examples. 839 F.3d 958, 983 & n.2 (11th Cir. 2016) (en banc), citing *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 656 (2006) (bankruptcy claimant could be "denied priority status"); *Chandris, Inc. v. Latsis*, 515 U.S. 347, 372 (1995) (maritime worker could "be denied seaman status"); *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991) (person trying to do seasonal work could be "denied SAW [special agricultural worker] status"); *Clark v. Gabriel*, 393 U.S. 256, 264 (1968) (draft registrant could be "denied CO [conscientious objector] status").

We have also used this "denial of status" phrasing in a variety of contexts. *Bell v. Kay*, 847 F.3d 866, 868 (7th Cir. 2017) (plaintiff objected to

And the word "status" is not necessarily limited to status as of any particular moment. 1 U.S.C. § 1 (Dictionary Act providing that "unless the context indicates otherwise … words used in the present tense include the future as well as the present").

In short, the effect of the phrase "otherwise adversely affects his status as an employee" on job applicants is at worst ambiguous for applicants like Kleber. The majority loads onto that phrase more weight than it can bear. If Congress really meant to exclude job applicants from disparate-impact protection, the phrase "status as an employee" was a remarkably obscure and even obtuse way to express that meaning.

D.  *Comparing § 623(a)(2) to Other ADEA Provisions*

Congress no doubt could have written § 623(a)(2) to make clearer its protection of outside job applicants, as it did in other ADEA provisions and other statutes. As explained by Justice Thomas for a unanimous Supreme Court in *Robinson v. Shell Oil*, however, that observation does not prove that Congress chose *not* to provide that protection. 519 U.S. at 341–

---

"the order denying him pauper status"); *McMahon v. LVNV Funding, LLC*, 807 F.3d 872, 875 (7th Cir. 2015) (observing that "the denial of class status is likely to be fatal to this litigation"); *Moranski v. General Motors Corp.*, 433 F.3d 537, 538 (7th Cir. 2005) (analyzing "denial of Affinity Group status" affecting a proposed group of employees); *Hileman v. Maze*, 367 F.3d 694, 697 (7th Cir. 2004) (plaintiff alleged injury resulting "from the denial of her status" as candidate in local election); *Resser v. Comm'r of Internal Revenue*, 74 F.3d 1528, 1532 (7th Cir. 1996) (appealing Tax Court's "denial of 'innocent spouse' status"); *Williams v. Katz*, 23 F.3d 190, 191 (7th Cir. 1994) (spurned intervenor permanently "denied the status of a party" in litigation); *Lister v. Hoover*, 655 F.2d 123, 124–25 (7th Cir. 1981) (plaintiffs "who were denied resident status and the accompanying reduced tuition" at a state university). In all of these cases, "status" was surely "adversely affected," to use the phrasing of § 623(a)(2).

42 (language in other statutes "proves only that Congress *can* use the unqualified term 'employees' to refer only to current employees, not that it did so in this particular statute").

The first statutory text that provides guidance on how to read § 623(a)(2) is the statute's stated purpose, which the majority largely disregards. Congress told us it set out to address "the incidence of unemployment, especially long-term unemployment" among older workers. 29 U.S.C. § 621(a)(3). In the statute, Congress said it was "especially" concerned about the difficulty older workers faced in trying to "regain employment when displaced from jobs"—in other words, when older workers were *applying for jobs*. See § 621(a)(1). Unemployment ends when a person who is not currently employed applies successfully for a job. As the ADEA itself provides, "it is … the purpose of this chapter to promote employment of older persons based on their ability rather than age." § 621(b).

The majority, however, focuses on comparing § 623(a)(2) to several neighboring provisions in the ADEA that distinguish clearly between current employees and job applicants. The majority, to support its improbable result, reads too much into the differences in wording.

The unlawful employment practices section of the ADEA begins with three subsections prohibiting age discrimination in employment by three different kinds of actors—private and public employers, employment agencies, and labor organizations. 29 U.S.C. § 623(a)–(c); see also § 630(b) (defining "employer"). Subsections (a), (b), and (c) are all worded slightly differently. In the following subsection (d), the ADEA prohibits retaliation by any of these private-sector actors. In another section, the ADEA provides for a different and even broader

policy prohibiting age discrimination in federal hiring and employment. § 633a(a).

The majority compares three of those ADEA provisions: the labor union provision in § 623(c)(2), the retaliation provision in § 623(d), and the federal government provision in § 633a(a). All three of these provisions use the phrase "applicant for employment." The majority invokes the common presumption that a difference in statutory wording signals a difference in Congressional intent and meaning. That presumption, however, is only a tool, not an inflexible rule. We need some basis beyond simple word-matching to believe that these particular differences in language were intended to distinguish the ADEA's disparate-impact provision from these other provisions to produce such an improbable result as excluding older job applicants from disparate-impact protection.

Instructive here is the Supreme Court's approach to interpreting the term "employee" in Title VII's anti-retaliation provision. *Robinson v. Shell Oil*, 519 U.S. at 339–41. Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment" who have either availed themselves of Title VII's protections or assisted others in doing so. 42 U.S.C. § 2000e-3(a). The issue in *Robinson* was whether this language prohibits retaliation against former employees. As in this case, the Court had to interpret a provision that was not as clear as other related provisions. The fact that "Congress also could have used the phrase 'current employees,'" or "expressly included the phrase 'former employees' does not aid our inquiry." 519 U.S. at 341. That "the term 'employees' may have a plain meaning in the context of a particular section," or that "other statutes have been

more specific in their coverage of 'employees' and 'former employees,' … proves only that Congress *can* use the unqualified term 'employees' to refer only to current employees"— "not that the term has the same meaning in all other sections and in all other contexts." *Id.* at 341–43.

Adopting an approach that fits here, the Court wrote: "Because the term 'applicants' in § 704(a) is not synonymous with the phrase 'future employees,' there is no basis for engaging in the further (and questionable) negative inference that inclusion of the term 'applicants' demonstrates intentional exclusion of former employees." *Id.* at 344–45. In fact, the Court reasoned, to hold that the term "employee" does not include former employees "would effectively vitiate much of the protection afforded by § 704(a)," and "undermine the effectiveness of Title VII by allowing the threat of postemployment retaliation to deter victims of discrimination from complaining to the EEOC, and would provide a perverse incentive for employers to fire employees who might bring Title VII claims." *Id.* at 345–46.

In short, the Court concluded, an "inclusive interpretation of 'employees' in § 704(a) that is already suggested by the broader context of Title VII"—and that is not "destructive of [the] purpose" of the statute by allowing an employer to escape liability for "an entire class of acts"—"carry persuasive force given their coherence and their consistency with a primary purpose" of the statutory provision. *Id.* at 346. We should use the same approach here.

Instead, the majority's reading of § 623(a)(2) creates a strange incongruity. All actors who regularly recruit job applicants—employment agencies, labor unions, and federal

agencies—are prohibited from engaging in age discrimina-
tion, including disparate-impact discrimination. See 29 U.S.C.
§§ 623(b), 623(c)(2), & 633a(a). Yet the majority concludes that
Congress chose to allow private *employers* to use practices
with disparate impacts on older job applicants. This is a truly
odd reading, especially in light of the statute's stated purpose
and the rest of § 623, where Congress grouped employers,
employment agencies, and labor organizations together with
respect to retaliation, job advertisements, and the use of bona
fide occupational qualifications and reasonable factors other
than age. See Pub. L. 90-202, § 4(d)–(f), 81 Stat. 603 (1967).

Half a century after the ADEA was enacted, we can see
that Congress could have been more precise in phrasing the
disputed provision. The majority errs, though, in concluding
boldly that the text "leaves room for only one interpretation."
Ante at 8. The majority naively puts on blinders, considers
only the language of the ADEA in isolation, and, as we'll see,
ignores precedent, legislative history, and practical conse-
quences to offer one cramped reading for the scope of
§ 623(a). The text alone does not provide sufficient grounds
for choosing between two readings of one of the statute's most
important protections, one that protects outside job appli-
cants, and one that excludes them.

II.  *Griggs, Title VII, and the ADEA*

   A.  *Griggs and "Job-Seekers"*

The most reliable basis for choosing between these two
readings of the statutory text is to follow the Supreme Court's
interpretation of identical language in Title VII of the Civil
Rights Act of 1964 in *Griggs v. Duke Power*, 401 U.S. at 430–31.

In *Griggs*, the Court held that the language of Title VII as enacted in 1964 included disparate-impact protection for both job-seekers and current employees seeking promotions. That authoritative construction of identical language should control here. See *Smith*, 544 U.S. at 233–38 (applying *Griggs* to § 623(a)(2) in ADEA); *Texas Dep't of Housing and Community Affairs*, 135 S. Ct. at 2518 (applying analysis of identical statutory language in *Griggs* (Title VII) and *Smith* (ADEA) to interpret parallel disparate-impact provision in Fair Housing Act); see also, e.g., *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987) (field preemption applies to ERISA because Congress copied ERISA's jurisdictional language from Labor Management Relations Act, to which field preemption applied).

### 1. *Parallel Statutory Texts*

The ADEA's § 623(a)(2) tracks word-for-word the parallel provision for race, sex, religious, and national origin discrimination in Title VII of the Civil Rights Act of 1964, as it was enacted in 1964, as it stood when the ADEA was enacted, and as it stood when *Griggs* was decided. Here's the original language of Title VII's parallel disparate-treatment and disparate-impact provisions:

> (a) It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

78 Stat. 255, quoted in *Griggs*, 401 U.S. at 426 n.1. The *only* difference between Title VII's § 703(a)(2) and the ADEA's § 623(a)(2) is the substitution of "age" for "race, color, religion, sex, or national origin." That's why *Smith v. City of Jackson* described *Griggs* as "a precedent of compelling importance" in interpreting the ADEA's disparate-impact language. 544 U.S. at 234.

In *Griggs*, the Supreme Court unanimously held that Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation"—e.g., practices with disparate impacts against protected groups. *Griggs*, 401 U.S. at 431. "The touchstone is business necessity," the Court explained, as "the very purpose of title VII is to promote hiring on the basis of job qualifications, rather than on the basis of race or color." *Id.* at 431, 434, quoting 110 Cong. Rec. 7247 (1964).

The majority contends *Griggs* offers no guidance here because "nothing about the case, brought as it was by employees of Duke Power and not outside applicants, required the Court to answer th[e] question" whether Title VII's disparate impact provision extended to job applicants. Ante at 10. The majority treats the Supreme Court's references in *Griggs* to hiring as careless slips of the pen. As a general rule, that is not how lower federal courts should read Supreme Court opinions.

More specifically, a closer look at *Griggs* shows that the majority's approach is 180 degrees off course.

### 2.  *The Facts of Griggs*

Beyond reasonable dispute, the *Griggs* holding included job applicants. The majority ignores the fact that *Griggs* was a class action. The district court had certified a class "defined as those Negroes presently employed, and who subsequently may be employed, at [Duke Power's plant] and all Negroes *who may hereafter seek employment*"—i.e., job applicants. *Griggs v. Duke Power Co.*, 292 F. Supp. 243, 244 (M.D.N.C. 1968) (emphasis added). After remand from the Supreme Court, the district court enjoined Duke Power from, among other practices, "administering any personnel or aptitude tests or requiring any formal educational background … as a condition of *consideration for employment* or promotion or transfer." *Griggs v. Duke Power Co.*, 1972 WL 215 at *1 (Sept. 25, 1972) (emphasis added). Of course the Supreme Court's holding applied to job applicants.

And that was for good reason. The *Griggs* class challenged employment practices that had the effect of segregating the workforce. Duke Power classified its employees into two main groups: (1) the "inside departments," historically staffed by white employees, with higher pay and responsible for tasks such as operating the boilers and maintaining the plant equipment; and (2) the Labor Department, the lowest-wage unit, "responsible generally for the janitorial services" and historically staffed by black employees. *Griggs v. Duke Power Co.*, 420 F.2d 1225, 1245–46 (4th Cir. 1970) (Sobeloff, J., dissenting); *id.* at 1228–29 (majority). Before the civil rights movement, white and black employees (within their respective segregated departments) had been hired and promoted with

middle school levels of education or less, and certainly without high school diplomas; there was no indication that any particular level of formal education was needed to work at the power plant. *Id.* at 1245–46 (dissent).

As the civil rights movement picked up steam, Duke Power "initiated a new policy *as to hiring* and advancement," requiring "a high school education or its equivalent … for *all new employees*, except as to those in the Labor Department." *Id*. at 1228–29 (majority) (emphasis added). On the day Title VII took effect, Duke Power "added a further requirement for *new employees*" —the passage of "two professionally prepared aptitude tests, as well as to have a high school diploma." *Griggs*, 401 U.S. at 428 (emphasis added). All existing employees (white and black) were grandfathered in. Only new Labor Department employees could still be hired without having to meet the requirements. *Griggs*, 420 F.2d at 1245–46 (dissent).[3]

Notwithstanding the new rule, if an "inside" position opened, the grandfathered white employees from "inside departments" without high school diplomas faced "no restriction on transfer from any of the inside departments to the other two inside departments." *Id*. at 1246 (Sobeloff, J., dissenting). It was "only the outsiders" (e.g., entirely new applicants or black Labor Department employees) who "must meet the questioned criteria." *Id.* This internal employee classifica-

---

[3] To be precise, the coal handling department was the one unit staffed by white employees that had been subject to the high school diploma requirement for transfer. The aptitude tests were offered at the coal employees' request as "a means of escaping from that department" and were then made available to employees in the Labor Department. *Griggs*, 420 F.2d at 1229; *Griggs*, 401 U.S. at 427–28.

tion policy therefore put the black Labor Department employees in the same position as outside applicants. Consequently, "four years after the passage of Title VII, [the Duke power plant] look[ed] substantially like it did before 1965. The Labor Department [wa]s all black; the rest [wa]s virtually lily-white." *Id.* at 1247.

Thus, it made no legal difference that the named class representatives were existing Labor Department employees challenging their restricted ability to transfer (read: apply) to the higher-paying units staffed with white employees. The Court's legal analysis was not limited to intra-company transfers: *all* new applicants and the Labor Department plaintiffs had to meet Duke's educational and testing standards to apply for non-janitorial open positions. *Griggs,* 401 U.S. at 425–28.

### 3. *The Supreme Court's Analysis*

Thus it was neither accidental nor surprising that the Supreme Court framed the issue as whether an employer could require a high school education or passing a general intelligence test as "a condition of employment in or transfer to jobs," *id.* at 426, signaling that the disparate-impact provision applied to both current employees and outside job applicants. The opinion also referred to the "*hiring* and assigning of employees" and to "tests or criteria for *employment* or promotion." *Id.* at 427, 431 (emphasis added). Even more clearly, writing for the unanimous Court, Chief Justice Burger explained:

> Congress has now provided that tests or criteria for employment or promotion may not provide equality of opportunity merely in the

> sense of the fabled offer of milk to the stork and
> the fox. On the contrary, Congress has now re-
> quired that the posture and condition *of the job-*
> *seeker* be taken into account. It has—to resort
> again to the fable—provided that the vessel in
> which the milk is proffered be one *all seekers* can
> use. The Act proscribes not only overt discrimi-
> nation but also practices that are fair in form,
> but discriminatory in operation.

*Id.* at 431 (emphasis added). The Court framed the issue and its holding as applying to the use of aptitude and personality tests for *both* hiring and promotion decisions because those were the facts at issue. A decision that applied only to intra-Duke transfers, as the majority reads it now, would have missed the whole point of plaintiffs' case.

Everyone understood that *Griggs* was the case testing disparate-impact coverage nationally. Given the class definition that included future job applicants, all judicial officers, parties, and amici understood that the stakes included protection for job applicants.[4] The amicus brief for the United States argued that the Court should hold that Title VII did not permit

---

[4] Judge Soboloff's dissent in the Fourth Circuit was prescient: "The decision we make today is likely to be as pervasive in its effect as any we have been called upon to make in recent years." *Griggs*, 420 F.2d at 1237. He continued: "The statute is unambiguous" in prohibiting "'objective' or 'neutral' standards that favor whites but do not serve business needs." *Id.* at 1238. After all, "[n]o one can doubt that [a] requirement would be invalid" if an employer issued the "neutral" criteria that "*all applicants for employment* shall have attended a particular type of school," but "the specified schools were only open to whites" and "taught nothing of particular significance to the employer's needs." *Id.* (emphasis added).

"an employer to require completion of high school or passage of certain general intelligence tests *as a condition of eligibility for employment in*, or transfer to, jobs formerly reserved only for whites" when these new requirements "disqualif[ied] Negroes at a substantially higher rate than whites" and were not "shown to be necessary for successful performance of the jobs." *Griggs v. Duke Power Co.*, Brief for the United States as Amicus Curiae at *2, 1970 WL 122637 (Sept. 4, 1970) (emphasis added). On the other side, the Chamber of Commerce cautioned that the "subject matter of the instant case—the utilization of educational or test requirements *to select employees for hiring* or promotion—is a matter of significant national concern." Brief Amicus Curiae on Behalf of the Chamber of Commerce of the United States of America at *1–2, 1970 WL 122547 (Oct. 14, 1970) (emphasis added).[5]

Against this background, there can be no serious doubt that *Griggs* recognized disparate-impact protection for both current employees and job applicants. Even the Court's take-away instructions for employers also addressed hiring: **"**Congress has now required that the posture and condition of the job-seeker be taken into account. … If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." 401 U.S. at 431. And this was so despite the fact that the Court was confronted with the same textual differences in Title VII that

---

[5]The Chamber of Commerce attorney also talked about hiring in oral argument: "We're talking about objective means of choosing which employee should fit in to a particular job or *which employee should be hired in the first place*…." Transcript of Oral Argument, *Griggs*, 401 U.S. 424 (No. 70-124), available at http://www.oyez.org/cases/1970-1979/1970/1970_124 (emphasis added).

we face in the ADEA today: the explicit reference to "hiring" in paragraph (a)(1), its omission in (a)(2), and the phrase "or otherwise adversely affect his status as an employee" in (a)(2).

The majority in this case therefore has its facts exactly backwards in asserting that "[n]owhere in *Griggs* did the Court state that its holding extended to job applicants." Ante at 9. One cannot reasonably read hiring and job applicants out of the opinion. After *Griggs*, no competent lawyer would have counseled employers that they were prohibited from basing only intra-company transfers and promotions on "neutral" but non-job-related tests, but remained free to use the same tests when hiring new employees.

B.   *Griggs' Aftermath and Title VII's 1972 Amendment*

   1.   *Later Judicial Treatment of Griggs*

Unlike the majority here, courts, employers, and scholars took *Griggs* at its word that its holding was broad and not limited to intra-company transfers and promotions. Within two years, a "plethora of prominent and forceful federal court rulings—from district court judges to the Supreme Court but perhaps most pointedly from the courts of appeal—had already won … sweepingly wide proactive employer compliance with Title VII's strictures." David J. Garrow, *Toward a Definitive History of Griggs v. Duke Power Co.*, 67 Vand. L. Rev. 197, 230 (2014).

Later Supreme Court decisions continued to read *Griggs* as governing hiring practices. E.g., *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 427 (1975) ("Like the employer in *Griggs*," the paper company defendant required "[a]pplicants for hire" to achieve certain test scores); *id.* at 425 (after *Griggs*, the "complaining party or class" must show "that the tests in question

select *applicants for hire* or promotion in a racial pattern") (emphasis added); *Dothard v. Rawlinson*, 433 U.S. 321, 329 (1977) (explaining that *Griggs* and *Albemarle Paper* "make clear that to establish a prima facie case of discrimination, a plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern"); *Connecticut v. Teal*, 457 U.S. 440, 446 (1982) (although requirements in *Griggs* "applied equally to white and black employees and applicants, they barred employment opportunities to a disproportionate number of blacks" and were therefore invalid); *Texas Dep't of Housing*, 135 S. Ct. at 2517 (explaining that *Griggs* "held that 'business necessity' constitutes a defense to disparate-impact claims" and did "not prohibit *hiring* criteria with a 'manifest relationship' to job performance") (emphasis added), quoting *Griggs*, 401 U.S. at 432. In short, lower federal courts have no business dismissing as careless dicta the *Griggs* references to job applicants.

###       2.   *Title VII's 1972 Revision*

None of the Court's later references to *Griggs'* application to hiring even mention, let alone rely on, the fact that, as part of a major 1972 revision to Title VII, Congress also engaged in some statutory housekeeping and added an express reference to "applicants for employment" to the disparate-impact provision, § 2000e-2(a)(2). Pub. L. No. 92-261, § 8(a), 86 Stat. 109 (1972). But the majority, apparently without engaging with the facts of the *Griggs* litigation or the legislation, opines that the 1972 Amendment actually "reflected Congress's swift and clear desire to *extend* Title VII's disparate impact protection to job applicants." Ante at 10 (emphasis added). The facts show again that the majority has it exactly wrong.

The year after *Griggs*, Congress enacted the Equal Employment Opportunity Act of 1972. It was a major bill designed to expand the powers of the EEOC and the scope of Title VII. But not every provision was important or controversial. The Act included this minor amendment not to change the law but to codify existing law as decided in *Griggs*.

The 1964 Act had confined the EEOC's role to "investigation, persuasion, and conciliation," and unlike other major agencies, it "lacked the authority to issue cease-and-desist orders or to initiate legal action in the federal courts." Herbert Hill, *The Equal Employment Opportunity Acts of 1964 and 1972*, 2 Berkeley J. Emp. & Labor L. 1, 7–8 (1977). The Department of Justice, which *did* have authority to sue to enjoin employment discrimination, filed "few suits" and "obtain[ed] only minimal benefits for the complainants." *Id.* at 29. By the end of 1971, the year *Griggs* was decided, the EEOC was already "handicapped by a backlog of more than 23,000 unresolved complaints of discrimination" and was subject to withering criticism. *Id*. at 31–33. There was concern that Title VII's results had been "disappointing" and "in most respects, proved to be a cruel joke to those complainants who have in good faith turned toward the Federal Government [which] cannot compel compliance"; thus there was general resolve that "promises of equal job opportunity made in 1964 must be made realities in 1971." *Id.* at 47–48, quoting S. Rep. No. 415, 92nd Cong., 1st Sess. 8 (1971).

The EEOC's limited powers were noted early. Efforts to strengthen it began almost immediately after the 1964 enactment. *Id*. at 32–33. It was clear, however, "that employers were vigorously opposed to any measure designed to increase the effectiveness of the law," and "[b]usiness interests conducted

an intensive lobbying campaign against the various proposals to extend Title VII coverage, provide enforcement power to the EEOC, or strengthen the antidiscrimination statute in any way." *Id.* at 33.

This years-long battle culminated in the 1972 Act. The Act's major provisions: authorized the EEOC "to initiate civil suits in federal district courts"; retained the then-controversial private right of action; created a new Office of General Counsel; expanded coverage to a larger number of private employers, most state and local government employees, and federal employees; and deleted the exemption for educational institutions. *Id.* at 50–58; Conf. Rep. on H.R. 1746, reprinted in 118 Cong. Rec. 7166, 7166–69 (March 6, 1972).

### 3. *Clarifying the Title VII Disparate-Impact Provision*

Along with these major changes, § 8(a) of the 1972 Act amended Title VII's disparate-impact language in § 2000e-2(a)(2) to add the reference to "applicants for employment." Pub. L. No. 92-261, § 8(a), 86 Stat. 109 (1972). The majority argues that, in light of this addition, concluding that *Griggs* had already covered job applicants "renders the 1972 amendment a meaningless act of the 92nd Congress." Ante at 10. Without considering the facts of the 1972 legislation as a whole, the majority has leaped to the wrong conclusion. It has overlooked the long-recognized difference between substantive and clarifying statutory amendments.

First, Congress was well aware of *Griggs*. The Court's opinion was mentioned several times in the lengthy legislative history—always favorably and typically described in terms tracking the discussion of *Griggs* above. One House report quoted *Griggs* to emphasize the importance of disparate

impact protections for "the job seeker" before noting that the "provisions of the bill are fully in accord with the decision of the Court." H.R. Rep. 92-899 at 21–22, reprinted in 118 Cong. Rec. 2156–57 (March 2, 1972), quoting *Griggs*, 401 U.S. at 431. Another House report described *Griggs* as a case "where the Court held that the use of employment tests as determinants of *an applicant's* job qualification … was in violation of Title VII if such tests work a discriminatory effect in *hiring* patterns" without a "showing of an overriding business necessity." H.R. Rep. 92-238 at 8, reprinted at 1972 U.S.C.C.A.N. at 2144 (emphasis added).

Amid the major policy changes in the 1972 Act, the addition of "applicants for employment" to the disparate-impact provision was a minor change, mentioned only briefly as incorporating existing law. The conference committee report to the Senate said that this addition was "merely declaratory of present laws." 118 Cong. Rec. at 7169. Congress noted its intention to "make it clear that discrimination against applicants for employment … is an unlawful employment practice" under both clauses of Title VII's § 2000e-2(a). 118 Cong. Rec. at 7169. This conference committee report to the Senate was the final report on § 8(a) of H.R. 1746, which added "or applicants for employment" to the provision, see 86 Stat. 103, 109 (approved March 24, 1972), essentially repeating an earlier Senate report that said this clarifying amendment "would merely be declaratory of present law." S. Rep. 92-415 at 43 (Oct. 28, 1971). Beyond these brief mentions, the addition of "applicants for employment" appeared not worthy of explanation at all.[6]

---

[6] The House version of the conference committee report contained the text of § 8(a) but provided no explanation. See H.R. Rep. 92-899 at 8, 19–

Consider these sparse comments in context. The recognition of disparate-impact liability in *Griggs* had been controversial and hard-fought between civil rights advocates and employers. If Congress thought in 1972 that it was changing the law to *extend* disparate-impact protection to reach job applicants, that change surely would have been significant enough to mention in the detailed committee reports.

And beyond Congress's silence about such a supposedly major change in the legislation, it beggars belief to think that employer groups would have let such an amendment pass without mention.[7] If, as the majority claims here, *Griggs* had actually left open whether job applicants were covered by Title VII's disparate impact provision, the Chamber and other employer groups would not have been silent. But they had already fought that battle, and they knew they had lost.

The majority is right that courts often assume that statutory amendments are intended to change the law. Ante at 11, citing, e.g., *United States v. Quality Stores, Inc.*, 572 U.S. 141, 148

---

20, reprinted in 92nd Cong., 118 Cong. Rec. 6643, 6645, 6648 (March 2, 1972). An earlier House report mentioned § 8(a) only in passing in the section-by-section analysis. See *id*. at 20–22, 30, reprinted in 1972 U.S.C.C.A.N. at 2155–57, 2165.

[7] Just months earlier, the Chamber of Commerce's attorney had argued to the *Griggs* Court:

This case is one which is a vital concern to employers, both small and large throughout the United States. In today's labor market, there are often many applicants for the job, just as there are many employees who desire to be promoted [and] the employer must make a choice … often a difficult one.

Transcript of Oral Argument, *Griggs*, 401 U.S. 424 (No. 70-124), available at http://www.oyez.org/cases/1970-1979/1970/1970_124.

(2014). But the majority overlooks the long-recognized reality that many statutory amendments are intended only to clarify existing law, not to change it. E.g., Singer, 1A Sutherland Statutes and Statutory Construction § 22:34 (7th ed. 2010).

The distinction is relevant most often in disputes over whether to give an amendment retroactive effect. Substantive amendments that change the law are rarely given retroactive effect, while "clarifying" amendments are routinely given such effect. See, e.g., *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 642 (7th Cir. 2016) (collecting cases). In this case, the distinction has a dramatic effect on what the 1972 amendment tells us about the scope of *Griggs* and the proper interpretation of the original Title VII language, which is identical to the ADEA language we interpret here.

How to tell when an amendment is substantive and when only clarifying? We explained in *Garbe*:

> In deciding whether an amendment is clarifying rather than substantive, we consider "[1] whether the enacting body declared that it was clarifying a prior enactment; [2] whether a conflict or ambiguity existed prior to the amendment; and [3] whether the amendment is consistent with a reasonable interpretation of the prior enactment and its legislative history."

824 F.3d at 642, quoting *Middleton v. City of Chicago*, 578 F.3d 655, 663–64 (7th Cir. 2009).

The evidence on all three of these factors shows that the 1972 amendment to the Title VII disparate-impact language was clarifying, not substantive. As shown above: (1) The enacting body announced that the new language only declared

current law and was consistent with *Griggs*. (2) Before the 1972 amendment, disparate-impact coverage for outside job applicants had been established in *Griggs*; that coverage was certainly no worse than ambiguous. (3) The 1972 amendment was "consistent with a reasonable interpretation of the prior enactment and its legislative history." That's exactly how the Supreme Court had read the language a year earlier in *Griggs* and how the decision was described in the 1972 amendment's legislative history.

In short, the facts refute the majority's unsupported claim that the 1972 amendment showed Congress's "swift and clear desire to extend Title VII's disparate impact protection to job applicants." Ante at 10. Without evidence that Congress was "extending" Title VII, there is no foundation here for the majority's further inference that Congress in 1972 was silently endorsing a narrower interpretation of identical language in the ADEA. The ADEA was never mentioned in the larger 1972 Act itself or in the conference report describing it. The 1972 Act amended only provisions of the 1964 Act and provides no support for the majority's narrower interpretation of the ADEA.

## C.  *Griggs and Smith v. City of Jackson*

In a further effort to diminish *Griggs*, the majority offers what it calls a "commonsense observation." If it was so clear that *Griggs'* Title VII analysis should apply to the ADEA's identical disparate-impact language, then it is "very difficult to explain why it took the Supreme Court 34 years to resolve whether anyone—employee or applicant—could sue on a disparate impact theory under the ADEA, as it did in *Smith v. City of Jackson*, 544 U.S. 228 (2005)." Ante at 8–9. Yet again, the

majority ignores the facts. It's easy to explain. The Court's opinion in *Smith* did so.

After emphasizing Title VII and the ADEA's "identical text" and "striking" contextual parallels, *Smith* noted somewhat bemusedly: "Indeed, for over two decades after our decision in *Griggs*, the Courts of Appeals uniformly interpreted the ADEA as authorizing recovery on a 'disparate-impact' theory in appropriate cases." 544 U.S. at 233–37 & n.5. Without a circuit split over identical statutory language, there had been no need for the Supreme Court to step in.

In *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993), however, the Court observed that "we have never decided whether a disparate impact theory of liability is available under the ADEA" and "we need not do so here." *Id.* at 610. A concurring opinion in *Hazen Paper* emphasized that "nothing in the Court's opinion should be read as incorporating in the ADEA context the so-called 'disparate impact' theory of Title VII of the Civil Rights Act of 1964" as "there are substantial arguments that it is improper to carry over disparate impact analysis from Title VII to the ADEA." *Id.* at 618. Those comments finally led to a circuit split on the question.[8]

---

[8] A year after *Hazen Paper*, we held that the ADEA did not permit any disparate-impact liability. *EEOC v. Francis W. Parker School*, 41 F.3d 1073, 1075 (7th Cir. 1994). In rejecting the reasoning in *Griggs*, we mistakenly emphasized the textual difference between Title VII and the ADEA, see 41 F.3d at 1077–78, overlooking the fact that *Griggs*, decided in 1971, considered exactly the same disparate-impact language that is in the ADEA. Inexplicably, the majority now repeats the same error: "We underscored this exact difference 14 years ago in our opinion in *Francis W. Parker*, and we do so again today"—"The 'mirror' provision in the ADEA omits from its

The Supreme Court then granted review in *Smith* to resolve the circuit split.[9] *Smith* endorsed the view that had been uniform before *Hazen Paper*: the ADEA recognizes disparate-impact claims. See 544 U.S. at 237 n.8, 240.

In fact, *Smith* cited with approval cases allowing disparate-impact ADEA claims by job applicants and others who did not have, according to the majority here, "status as an employee." *Id*. at 237 n.8, citing *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1423–24 (10th Cir. 1993) (laid-off warehouse workers applying for jobs with new buyer of warehouse); *Wooden v. Board of Educ. of Jefferson Cty.*, 931 F.2d 376, 377 (6th Cir. 1991) (applicant for full-time teaching positions).[10] *Smith*

---

coverage, 'applicants for employment.'" Ante at 13. This was simply not so in *Griggs*.

[9] The Chamber of Commerce again weighed in, arguing against extending *Griggs'* disparate-impact analysis to the ADEA. The Chamber had still not, however, hit upon the textual reading argued here, that job applicants should be excluded from the ADEA's disparate-impact provision. Brief of Amicus Curiae Chamber of Commerce of the United States of America in Support of Respondents, 2004 WL 1905736 at *15 (Aug. 23, 2004) (conceding that the reasoning of *Griggs*, which prohibited "segregation of departments by race," "applies equally to the ADEA, which sought to eliminate these kinds of express age 'limits' and 'classifications,' which frequently were used against older workers. E.g. Labor Report at 21 (discussing 'persistent and widespread use of age limits in hiring').").

[10] Other earlier cases not cited in *Smith* had also allowed disparate-impact age claims by job applicants. E.g., *Lowe v. Commack Union Free School Dist.*, 886 F.2d 1364, 1365–70 (2d Cir. 1989) (laid-off teachers later re-applied but were not hired); *Geller v. Markham*, 635 F.2d 1027, 1030 (2d Cir. 1980) (upholding jury award for teacher applicant temporarily hired, then passed over in favor of younger applicant due to "cost-cutting policy"); *Leftwich v. Harris-Stowe State College*, 702 F.2d 686, 689–90 (8th Cir. 1983) (faculty member forced to re-apply for job and not hired).

thus seemed to end the questioning of *Griggs'* relevance to the ADEA's disparate-impact provision. See, e.g., *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 95 (2008) (confirming that § 623(a)(2) covers employment practices with disparate impacts on older workers); *Texas Dep't of Housing*, 135 S. Ct. at 2518.

*Smith* did not end the long tug-of-war between employers and workers over competing interpretations of civil rights legislation. The authors of *Hazen Paper* concurred in *Smith* but planted the seed of today's dispute. Justice O'Connor, joined by Justices Kennedy and Thomas, concurred in the judgment "on the ground that disparate impact claims are not cognizable." *Smith*, 544 U.S. at 248. A primary reason, they argued, not to defer to the EEOC's regulation that treated § 623(a)(2) as covering disparate-impact claims, was because the regulation also read the provision to cover employers' hiring practices—and thus protected applicants for employment. *Id.* at 266. The concurrence pointed to the difference in language between § 623(a)(1) and (a)(2) and asserted that "only" § 623(a)(1) protects applicants and therefore the EEOC regulation "must" have read a disputed ADEA provision to "provide a defense against claims under [§ 623(a)(1)]—which unquestionably permits only disparate treatment claims." *Id.* Obviously that view did not carry the day in *Smith*.[11]

Still, here we are. The resources that employers deployed in *Smith* to try to avoid all ADEA disparate-impact claims

---

[11] Justice Scalia's concurrence specifically rejected that reasoning as to the EEOC regulation and, since the line drawing between applicants and current employees was beyond the scope of *Smith* itself, expressed his agnosticism on that issue. *Smith*, 544 U.S. at 246 n.3.

have been repurposed. Now they are deployed in a new campaign to show that the "plain text" of § 623(a)(2) permits employers to maintain irrational policies that disadvantage older individuals so long as those individuals have not yet been hired by the employer. Today's majority is not the first circuit to bite on this argument. The Eleventh Circuit has beaten us to it, ironically producing four opinions on the "plain" meaning of the text. *Villareal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958 (11th Cir. 2016) (en banc). We should not adopt this deliberately naïve and ahistorical approach.

III. *Practical Consequences and Statutory Purpose*

The text and precedent favor the view that job applicants may bring disparate-impact claims under the AEDA. In construing ambiguous statutory language, it also makes sense to consider the practical consequences of the different readings of § 623(a)(2) and how they fit with the overall statute's design and purpose. E.g., *Graham County*, 559 U.S. at 299–301 (considering practical consequences when determining better reading of statute); *Dewsnup v. Timm*, 502 U.S. 410, 416–20 (1992) (same); *Burwell*, 135 S. Ct. at 2489 (same). Those considerations weigh heavily against the majority here.

A simple hypothetical shows how improbable and arbitrary the majority's reading is. Suppose the majority is correct that § 623(a)(2) applies only to current employees. Imagine two applicants for the defendant's senior counsel position here. Both are in their fifties, and both have significantly more than seven years of relevant legal experience. One is Kleber, who does not currently have a job with the defendant. The other already works for the defendant but wants a transfer or promotion to the senior counsel position. Both are turned down because they have more than the maximum seven years

of experience. According to the majority, the inside applicant can sue for a disparate-impact violation, but the outside one cannot.

That result is baffling, especially under a statute with the stated purpose "to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b). And the majority's view depends entirely on the assumption that the statutory phrase "otherwise adversely affect his status as an employee" cannot possibly be applied to an individual who is, because of the challenged employment practice, completely *denied any status* as an employee. I cannot imagine that when the ADEA was enacted, "a reasonable person conversant with applicable social conventions would have understood" the ADEA as drawing the line the majority adopts here. See John F. Manning, *What Divides Textualists from Purposivists?*, 106 Colum. L. Rev. 70, 77 (2006); accord, *In re Sinclair*, 870 F.2d 1340, 1342 (7th Cir. 1989) (legislative history may provide context for statutory language and "may be invaluable in revealing the setting of the enactment and the assumptions its authors entertained about how their words would be understood").

Under the majority's interpretation, still further arbitrary line-drawing will now be needed. Suppose the applicant is currently employed by a sister subsidiary of the employer. Does she have the right "status as an employee" so that she can assert a disparate impact claim? Should the answer depend on some sort of corporate veil-piercing theory? Or suppose the applicant was recently laid off by the employer and challenges its failure to recall her. Or suppose the applicant currently has a position through a temporary employment

agency, working side-by-side with employees. I see no arguable reason to exclude any of these applicants from the disparate-impact protection of paragraph (a)(2).

Neither the majority nor the defendant or its amici have offered a reason why Congress might have chosen to allow the inside applicant but not the outside applicant to assert a disparate-impact claim. I can't either. Faced with the arbitrary consequences of drawing this line half a century after Congress drafted the legislation, the majority shrugs and says tautologically that it's "the province of Congress to choose where to draw legislative lines and to mark those lines with language." Ante at 14.[12]

Of course, Congress can and often does draw arbitrary lines when it wants to do so. When it does, courts enforce

---

[12] Far from offering a reason, defendant defiantly claims that just because Congress has drawn the line between "employees" and "applicants" "for no good reason, and that the line might create hypothesized anomalies, [that] is no reason to disregard Congress' words." Petition for Rehearing En Banc, Dkt. 43 at 10 (May 10, 2018). The Chamber of Commerce amicus brief feints toward ascribing intent to Congress, arguing that foreclosing applicants from recourse was "[o]ne of the careful lines drawn by Congress" because the ADEA "strikes a careful balance between prohibiting irrational barriers to employment of older workers and preserving employers' ability to adopt sound hiring policies." Dkt. 19 at 3, 1 (Sept. 6, 2018). There is no evidence of such a deliberate choice in § 623(a)(2). Under the Chamber's theory, that "balance" is shifted entirely in employers' favor. An employer can set wildly irrational hiring criteria—such as requiring Twitter, Instagram, and Snapchat proficiency for an entry-level position at a fast-food joint, which would likely have a large disparate impact on older workers. As long as that position is not open to internal applicants, that would be a highly effective yet immune "barrier to employment of older workers." That's not a "careful line." It's nonsense.

those lines, absent constitutional problems. See, e.g., *Stephens v. Heckler*, 766 F.2d 284, 286 (7th Cir. 1985) (Congress can dictate outcomes even though "there is no shortage of arbitrariness in disability cases"); *First Chicago NBD Corp. v. Comm'r of Internal Revenue*, 135 F.3d 457, 460 (7th Cir. 1998) ("arbitrariness is everywhere in the tax code, so that an approach to interpretation that sought to purge the arbitrary from the code would be quixotic"). But when the statutory language is at worst ambiguous, see above at 21–27, courts should not embrace such arbitrary results so at odds with the stated statutory purpose. See, e.g., *Graham County*, 559 U.S. at 283, 299–301 (False Claims Act); *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 564, 578 (1995) (Securities Act of 1933); see also, e.g., *Kennedy v. Chemical Waste Mgmt., Inc.*, 79 F.3d 49, 51 (7th Cir. 1996) (Americans with Disabilities Act); *Martin v. Luther*, 689 F.2d 109, 114 (7th Cir. 1982) (reaching conclusion about parole revocation "supported by common sense and an assessment of the practical consequences, which naturally guide our interpretation of legislative enactments").

The majority's arbitrary line undermines the stated purpose of the statute. Statutory purpose here is not a matter of judicial inference but of statutory declaration in the text enacted by both Houses of Congress and signed by the President. Congress enacted the ADEA to address unfair employment practices that make it harder for older people to *find* jobs. 29 U.S.C. § 621(a). That purpose was reflected in a variety of statutory provisions, as noted above. In addition to the statute's specific reliance on its stated purpose, we know from the 1965 Department of Labor report that was the catalyst for the ADEA—known as the Wirtz Report—that Congress had job applicants very much in mind. Report of the Secretary of La-

bor, *The Older American Worker: Age Discrimination in Employment* (June 1965), reprinted in U.S. Equal Employment Discrimination in Employment Act (1981), Doc. No. 5 (the Wirtz Report).

Under the majority's reading of § 623(a)(2), the ADEA's protection of the "employment opportunities" of "any individual" prohibits employment practices with disparate impacts in firing older workers and in promoting, paying, and managing them, *but not in hiring them!* Congress was concerned about all of these forms of discrimination. Wirtz Report at 21–22; see also *Employment of Older Workers*, 111 Cong. Rec. 15518, 15518–19 (1965) (describing Wirtz Report as urging "a clear, unequivocal national policy against hiring that discriminates against older workers" and referring to "job openings," and "applicants over 45"); *EEOC v. Wyoming*, 460 U.S. 226, 231 (1983) (observing that Wirtz Report concluded "arbitrary age discrimination was profoundly harmful … [because] it deprived the national economy of the productive labor of millions … [and] substantially increased costs in unemployment insurance and federal Social Security benefits" for older workers who could not land a job).

A central goal—arguably the most central goal—of the statute was to prevent age discrimination *in hiring.* Congress and the Wirtz Report explained that the problem stemmed not just from explicit bias against older workers (i.e., disparate treatment), but also from "[a]ny formal employment standard" neutral on its face yet with adverse effects on otherwise qualified older applicants. Wirtz Report at 3; see also *Smith*, 544 U.S. at 235 n.5. Those neutral standards and other thoughtless or even well-intentioned employment practices can be addressed only with a disparate-impact theory under

§ 623(a)(2). The report made clear that the older people who suffered the disparate impact from such practices were those trying to get hired in the first place. The report explained that despite the beneficial effects of such policies, "ironically, they sometimes have tended to push still further down the age at which employers begin asking *whether or not a prospective employee is too old to be taken on*." Wirtz Report at 2 (emphasis added).

Against this evidence of contemporary understandings, the majority offers no plausible policy reasons, but only its wooden and narrow textual interpretation, which is anything but inevitable. Wearing blinders that prevent sensible interpretation of ambiguous statutory language, the majority adopts the improbable view that the Act outlawed employment practices with disparate impacts on older workers, but excluded from that protection everyone not already working for the employer in question.

*   *   *

Given the statutory language in § 623(a)(2), the interpretation of that language in *Smith* and identical language in *Griggs*, the practical consequences of the interpretive choice, and the absence of any policy rationale for barring outside job applicants from raising disparate-impact claims, we should reject the improbable and arbitrary distinction adopted by the majority. We should hold that outside job applicants like Kleber may bring disparate-impact claims of age discrimination. I respectfully dissent.